25 P.(2d) 197

**HEPP v. QUICKEL AUTO & SUPPLY CO.**

No. 3674.

Supreme Court of New Mexico.

Sept. 12, 1933.

Raymond R. Ryan and J. S. Vaught, both of Albuquerque, for appellant.

Reid & Iden, of Albuquerque, for appellee.

SADLER, Justice.

After the presentation of able oral arguments and helpful briefs upon a rehearing granted in this case, we remain convinced that the result reached in the original opinion is sound. We have concluded, however, to withdraw the opinion heretofore filed and to substitute the present opinion therefor.

The plaintiff, Margaret Hepp, who is appellant in this court, as administratrix of the estate of her deceased husband, Edgar Hepp, sought damages from the defendant, a New Mexico corporation, engaged in the garage business at Albuquerque, before the district court of Torrance county, by reason of the death of her husband on the public highway about two miles east of Encino, in Torrance county, N. M.

At the close of plaintiff's case in chief the court upon defendant's motion directed a verdict in its favor. Judgment was entered upon the verdict that plaintiff take nothing and that defendant recover its costs. The present appeal is prosecuted to review that judgment; the only point relied upon for reversal being the claimed error of the court in directing a verdict in favor of the defendant. The plaintiff contends that her evidence was sufficient to support a verdict in her favor, and that the directed verdict against her was therefore unwarranted. She is correct in her statement that a verdict should not be directed in the face of evidence which, if accepted by the jury and made the basis of its action, would support a verdict in favor of the party against whom it is directed. It follows that our attention is at once drawn to a determination of whether plaintiff's evidence made out a prima facie case entitling her to go to the jury.

The plaintiff's intestate had purchased a model A two-door Ford sedan about June 14, 1929, and, after having driven same approximately two thousand miles, left it with defendant for the last of three servicings which had been promised him by it in connection with the sale of the car. This occurred on July 15, 1929. The defendant's employees

were at this time informed that plaintiff and her husband were preparing to start on a long trip. The car remained at the defendant's garage for servicing from the time of its delivery there on July 15th until 7 o'clock on the evening of the 16th, except that it was driven to and remained at the home of plaintiff the intervening night of the 15th. On the evening of the 16th it was turned back to the plaintiff and her husband as a finished job.

While the car was in defendant's charge, it had been found necessary to place a new spindle on the left front wheel, an undertaking which involved the tearing down of the brake assembly and its restoration, with consequent readjustment of the brakes. Upon the morning of July 17th, just before starting upon their trip, a "squeak" near the engine having developed, plaintiff and her husband drove the car to the garage of defendant to have this trouble removed. While plaintiff was in the car with one of defendant's employees, driving around a few blocks to locate the "squeak," she inquired of him why a new car should need another spindle so soon, to which inquiry plaintiff testified he answered: "A. I don't know the terms he used, but he told me that some times those spindles got hot is the way I understood it and melted and locked, and I said I hoped it don't happen in this case, and he informed me that it had been fixed and it wouldn't lock, it was all right."

Finally having located and removed the "squeak" in the car, plaintiff and her husband, the intestate, started on a trip to Roswell. The car functioned properly and the brakes worked as if in good order and after apparently proper adjustment for a distance of about 110 miles. Then, while plaintiff was driving the car at a speed not exceeding 45 miles per hour over a smooth straight stretch of road about two and a half miles east of Encino, without any application of the brakes and without the touching of any part of the car by its occupants to cause such an occurrence, the left front wheel apparently locked, causing the car to swerve suddenly to the left from the right-hand side of the road where it was traveling and overturn in the ditch, resulting in the death of plaintiff's intestate.

The plaintiff, without attempting to point out or indicate the specific act of negligence responsible for the locking of the left front wheel, charged generally that defendant was careless and negligent in the setting and adjustment of the brakes on said car, and particularly on the left front wheel, and that it so adjusted them that, when the car should have traveled for any considerable length of time, the brake would adhere and lock, thus preventing the revolution of the wheel to which the brake was attached. These allegations of negligence were met by a general denial.

The plaintiff invokes and relies upon the doctrine of res ipsa loquitur, as making out a prima facie case entitling her to go to the jury. Whether, apart from the reason which induces us to pass the question, the doctrine

relied upon is applicable in the instant case, is debatable. It is recognized as a rule of necessity, and is based upon the postulate that under the common experience of mankind an accident of the particular kind does not happen except through negligence. It bases its chief claim to justification on the fact that ordinarily the cause of the injury is accessible to the party charged and inaccessible to the person injured.

But, where the facts and circumstances surrounding the injury themselves point with sufficient definiteness to negligence on the part of defendant to warrant an inference thereof, then the reason for an application of the rule fails. The plaintiff under such circumstances is entitled to reach the jury, not by reason of any presumption deduced from common experience, but by force of permissible inferences from the evidence itself.

In other words, where circumstantial evidence touching the injury is sufficient to warrant an inference that some fault of omission or commission representing a breach of duty owing from defendant to the plaintiff caused the injury, the jury is permitted to make a finding of negligence upon the facts adduced in the instant case, apart from, and irrespective of, the doctrine of res ipsa loquitur.

In actual operation, the doctrine of res ipsa loquitur and an application of the rules of circumstantial evidence in negligence cases frequently overlap, and much loose expression is found in the books and decisions, upon the right to look to the circumstances surrounding the injury for the purpose of determining the applicability of the res ipsa loquitur rule. But that in the application of this doctrine as a distinctive rule the probative force of surrounding circumstances evidential of negligence in the particular case are not properly to be considered we are well satisfied.

The proper limitation on the use of the phrase "surrounding circumstances" as frequently employed in connection with a statement of the rule of res ipsa loquitur is well expressed by Judge Pound in Plumb v. Richmond Light & R. R. Co., 233 N. Y. 285, 135 N. E. 504, 505, 25 A. L. R. 685, where, writing the opinion of the court, he said: "The only question thus presented is whether res ipsa loquitur was properly applied. Res ipsa loquitur is a loose but much-used phrase of limited application, which is a symbol for the rule that the fact of the occurrence of an injury and the surrounding circumstances may permit an inference of culpability on the part of the defendant, make out plaintiff's prima facie case, and present a question of fact for the defendant to meet with an explanation. The term 'surrounding circumstances' in this connection refers not to circumstances directly tending to show lack of care in handling, such as excessive speed, lack of proper control of the car, and the like, which tend in themselves to establish plaintiff's case, but only to mere neutral circumstances of control and management by the defendant, which may, when explained, appear to be entirely consistent with due care."

Instructive case notes illustrating and emphasizing the distinction between res ipsa loquitur as a distinctive rule, that is, in the purity of its application, and the true field for resort to the rules of circumstantial evidence, are to be found in 59 A. L. R. 468 and 78 A. L. R. 731. We quote from the editor's annotation in 59 A. L. R. 470, 471, as follows:

"In other words, in the situation to which res ipsa loquitur as a distinctive rule applies, there is no evidence, circumstantial or otherwise, at least none of sufficient probative value, to show negligence, apart from the postulate—which rests on common experience and not on the specific circumstances of the instant case—that physical causes of the kind which produced the accident in question do not ordinarily exist in the absence of negligence; that is, in the absence of a breach of duty such as defendant owed to plaintiff. * * *

"The principle as to circumstantial evidence measures and accepts the probative force of specific circumstances as evidence of what in the instant case lay behind the physical cause of the accident and was responsible for it. Res ipsa loquitur as a distinctive rule does not measure or accept the probative force of circumstances, at least the specific circumstances peculiar to the instant case, but accepts the teaching of common experience with reference to physical causes of the kind which produced the accident."

This distinction in the application of the two rules is recognized in North Memphis Sav. Bank v. Union Bridge & Construction

Co., 138 Tenn. 161, 196 S. W. 492, 496, where the court said: "The rule res ipsa loquitur, in its primary or distinctive sense, may be thus defined: Where the evidence shows an injury inflicted, and also the physical thing inflicting it, and that thing does not usually, or in the ordinary course, produce such a result where due care is exercised by those in charge of it, it may be inferred that those so in charge of the thing inflicting the injury failed to exercise such due care; that is, that they were guilty of negligence. The term res ipsa loquitur is often used in the more extensive sense of including all pertinent facts both antecedent and subsequent to the infliction of the injury, which facts tend in and of themselves to indicate the responsible human agency. The former seems to us the more accurate. It seems to us also the more useful because easily applicable to all cases, its outline being clear."

With the distinction drawn by these authorities now clearly in mind, we shall proceed to examine the evidence to see if circumstances evidential of negligence on defendant's part were sufficiently shown to warrant submission of the case to the jury. Those immediately surrounding the accident, so far as within the knowledge of plaintiff, have already been stated. It further appeared in evidence that the wrecked car was towed into a certain garage in Encino, where it remained for some weeks following the accident. While there, it was examined by two expert automobile mechanics. When it was first attempted to get the car back on

the highway, it was observed that the left front wheel would not turn, and the garage attendants could not cut front wheels to right. Some difficulty was experienced in keeping car on highway on trip to Encino garage because of tendency to pull to the right.

A few weeks after it was placed in this garage, an examination disclosed nothing wrong with right front wheel. It turned smoothly, came off naturally and easily. But it was found difficult to turn or to remove the left front wheel. It had to be struck several times with a tire iron in order to remove it from the axle. After its removal, an examination of the inside of the brake drum disclosed blue streaks or "scoring" on the metal and small "pitted" places in it, indicating the presence of considerable heat. The metal had been "rolled" from these small "pitted" places and had accumulated in heat ridges inside the brake drum.

Art Lewis, one of the experts, testified that the evidence of heat and "scoring" which he found in the brake drum indicated that the brake mechanism had become stuck in some way, to adhere in that manner, or that "the party driving that model Ford could have had the emergency brake on," which would have caused all the brakes to heat. Further, that a rough place on the cam or hanging up of the cable might operate to cause such a condition, but that these conditions could not obtain if the brakes were properly set, "not unless something happened while driving, which isn't likely."

This same witness on cross-examination expressed the opinion that the expanded condition of the brake on this wheel, as he found it, could have been caused by broken or weak springs (witness had not examined the springs on this car). As to further possible causes of the condition noted the witness testified: "A. Or could have been a rough place on the lower cam, or it could have been a stuck rod, the little rod I was talking about going through the spindle bolt, which is not very likely because that has a large loose fit. Or could have been the upper cam sticking from too tight a fit or lack of grease."

It further appeared from the testimony of this witness that the replacement of a new spindle involved the taking apart of the brake assembly and the complete readjustment of the brake equipment on the particular car involved; that, when a new spindle goes in, every one of the different parts of the brake equipment must be gone over with great particularity, and any discoverable defects ascertained and cared for in order to make a proper adjustment.

The witness gave his expert opinion as follows:

"Q. Mr. Lewis, if the brakes on that left front wheel had been properly adjusted, would it have been possible for that car to have locked, the wheel? A. No, sir.

"Q. From what you observed there from your examination of the condition of the brake band and the brake drum, your opinion is that the locking of the wheel was

caused from improper adjustment of those brakes? A. Yes, sir."

Ed Monyer was another expert automobile mechanic of 20 years' experience who testified for plaintiff. When he examined the wrecked car at the Encino garage a few weeks after the accident, he discovered practically the same discoloration of metal from scoring and pitted condition inside brake drum as that described by the expert who preceded him. He stated: "A. Well, there has been excessive friction at some time or other and with the heat the metal had seized on to the brake band and had rolled out causing a pitted condition where this metal had rolled from, and a noticeable ridge or raised place where it had adhered to the brake drum."

Upon raising the left front wheel with a jack and attempting to turn same in direction of rotation, he found it took "quite a little bit of pressure to move it, but after it had been moved a distance of about four or five inches, it freed up and turned over about one-half revolution. It then became tight again and required quite a little pressure or force to move it on around." He found no indication of the brake lining being burned or charred. The brake mechanism was apparently in proper position, but, on taking hold of the brake pull rod (a rod attached to one of the cams), and "pulling down on it, drawing the lever back, which would be in the right position, the lever refused to return to the off position. * * * However, after operating that a matter of four or five times, the mechanism seemed to free up and would then return to normal position." This indicated to the witness that there was some defect in the operating mechanism of the brake.

Asked his opinion on what caused the brake to lock, from what he observed at his examination of it, he testified:

"A. The mechanism indicated there was something there that had allowed the brake to be applied at some time previous to the accident and had refused to allow them to loosen up.

"Q. And what indication did you see there that would have brought that condition about? A. The fact that the substance on the brake lining had rolled and also the discoloration of the brake drum.

"Q. What did that discoloration of the brake drum indicate? A. It indicated that it had been hot.

"Q. Now, what would have caused that heat there on the drum? A. Could have been a dragging brake.

"Q. Could it be caused from anything else? A. Only by somebody applying heat from an outside source to it."

This expert stated the conditions he found could have occurred even with a proper adjustment of the brake bands but not with a proper adjustment of the brakes and all of the brake assembly. His inspection of the wheel and brake equipment left him with the opinion that the brake had locked.

A warped or "out of round" condition was also found by him in this brake drum. On cross-examination he was asked:

"Q. What could cause that brake drum to become out of round? A. Warpage.

"Q. What could cause it to warp? A. Heat.

"Q. And what could cause it to heat? A. Friction.

"Q. And what causes the friction? A. The brake lining dragging on the brake drum."

He expressed the opinion that the condition found could have been caused by lack of lubrication or some obstruction in the tube marked "I" on diagram, but did not go inside the tube to see if it lacked lubrication or to see if there was an obstruction—merely examined it to see if it was working freely, and found it was not. What he discovered made it clear in his mind that "the rod marked H wasn't operating properly through tube I." He could not undertake to say what the defect was, but did say a defect was there. His cross-examination proceeded:

"A. The defect I found there wasn't caused by misadjustment of the parts; it was caused by faulty installation or faulty lubrication.

"Q. No faulty parts? A. None that I observed.

"Q. And you didn't try to determine which it might be. You have limited it now to faulty lubrication or faulty installation? A. Yes, sir.

"Q. Or (of) what? A. Faulty lubrication of parts.

"Q. What parts? The brake parts? A. Rod H and the tube I, or brake parts.

"Q. But not the parts B and C, you eliminate that now, do you? A. No, I don't eliminate them at all.

"Q. Didn't you say the brakes themselves were properly adjusted? A. Properly adjusted, absolutely; but, your adjustment means nothing with faulty mechanism operating them."

The witness further stated in answer to a hypothetical question by defendant's counsel that, if the shaft from the crank to the operating cam indicated should become bent or twisted in usage, it should be detected by the mechanic, but that such a condition could occur from usage after adjustment of the brakes. He admitted that the condition in which he found Exhibit 5, a particular part of the brake assembly, at time of his examination, could possibly have developed after the adjustment, but stated such was not likely. He would not undertake to say whether the condition noted might or might not have been caused by the wreck, but adhered to his opinion that faulty action of the brake mechanism had locked the car.

It has seemed desirable to state the evidence at somewhat greater length than is ordinarily required, the better to test the correctness of the trial court's action in directing a verdict in favor of defendant at the close of plaintiff's case in chief. After a

careful review of this evidence, circumstantial though it may be, and of permissible inferences flowing therefrom, we are convinced the plaintiff's case in chief had fairly met the requirement resting upon her of making out a prima facie case. This passed to defendant, not the burden of proof on the case as a whole, but the duty of producing evidence to meet the prima facie case thus erected against it.

In reaching this conclusion, we do not invoke the distinctive rule of res ipsa loquitur, thereby relying upon inferences of fact deducible from common experience. Inferences so drawn are provoked by an absence of evidence. Here we find the presence of facts and circumstances surrounding the injury sufficiently suggestive of the proximate cause thereof to warrant a jury in drawing the inference of negligence, if it should so determine.

None could question the right of a jury, from the evidence as we have related it, to locate the trouble causing the injury in the brake equipment of the left front wheel. That considerable heat had been there generated was self-evident. Furthermore, the witness Moyner testifying as an expert stated it required considerable pressure to move this wheel in the direction of rotation. After being moved four or five inches, it worked more freely, but, upon being turned about half a revolution, it would tighten up and again require "quite a little" pressure to move it on around.

This same witness found trouble in the brake pull rod. After taking hold and pulling down on it, "the lever refused to return to the off position." This indicated to him some defect in the operating mechanism of the brake. He found that "the rod marked H wasn't operating properly through the tube I." This condition he attributed either to "faulty installation or faulty lubrication."

But we shall proceed no further in a discussion of the facts. We reluctantly have discussed them at all in view of the necessity of a retrial of the case. We have endeavored to limit such discussion to a demonstration that the jury might within the field of legitimate inference, from the facts adduced, find a breach of the duty owing from defendant to the injured person in connection with the former's adjustment of the brakes on the automobile in question.

While it is true the evidence does not indicate with certainty whether the trouble in rod H and tube I was "faulty installation" or "faulty lubrication"; nor just which of the defects discovered in the operation of the brake equipment, and pointed out in the evidence, caused the friction and consequent locking of the left front wheel, we are satisfied that in the realm of probabilities the evidence so narrows the field that it was within the sphere of legitimate inference for the jury to find, if it so elected, that the injury resulted from one or the other of the causes in respect of which there was a duty owing from defendant to the injured party.

■ It is not always essential, where proof of negligence rests on circumstantial evidence, that the jury's finding relate itself to negligence in a particular respect, if it reasonably may be referable to several acts or omissions with respect to each of which the defendant is charged with a duty toward plaintiff.

In Cobb v. Twitchell, 91 Fla. 539, 108 So. 186, 188, 45 A. L. R. 865, in explaining the jury's verdict in a brush fire case, the court said: "Upon the state of facts before us, and in the absence of mitigating circumstances, a jury might reasonably conclude that the defendant, or his servants, did not observe reasonable prudence and ordinary care under the circumstances, in that they were not sufficiently thorough in extinguishing the original fire; or that the fire guard constructed by them, in its dimensions or manner of construction, was not adequate or suitable under the circumstances; or that the defendant, or his servants, were not appropriately alert in watching the burned area, and the immediately adjacent vicinity, to prevent a recurrence of the fire, since the recurring fire had already covered a considerable area before its discovery."

■ And that proof of negligence may rest entirely in circumstances is firmly established. See under topic "Negligence," 20 R. C. L. § 149, pp. 180, 181; 7 R. C. L. Permanent Supplement, p. 4853, § 149, and cases cited.

It frequently happens that the doctrine of res ipsa loquitur is invoked, its application denied or disregarded, and yet ruled that the case was entitled to go to the jury without the aid of the doctrine. Whether so or not must, of course, depend upon the facts of each particular case. See Rosellini v. Salsich Lbr. Co., 71 Wash. 208, 128 P. 213, 215; St. Clair v. Edison Elec. Light Co., 38 Pa. Super. Ct. 228; Pope v. Reading Co., 304 Pa. 326, 156 A. 106; Lyon v. Chicago, M. & St. P. Ry. Co., 50 Mont. 532, 148 P. 386; Heffter v. Northern States Power Co., 173 Minn. 215, 217 N. W. 102; Western Steel Car & Foundry Co. v. Cunningham, 158 Ala. 369, 48 So. 109; Burghardt v. Detroit United R. Co., 206 Mich. 545, 173 N. W. 360, 5 A. L. R. 1333.

■ It is recognized, too, that in proving negligence circumstantially absolute certainty cannot be achieved. As said in Rosellini v. Salsich Lumber Co., supra: "In this class of cases absolute certainty cannot be required. There must be a point where, if a prima facie case is made, the burden shifts. It then became the duty of the defendant to meet this prima facie case and offer a reasonable explanation of the cause of the accident. Scarpelli v. Washington Water Power Co., 63 Wash. 18, 114 P. 870."

The Illinois Appellate Court expresses the same thought, although in different language, in Rost v. Kee & Chapell Dairy Co., 216 Ill. App. 497, where it said: "Absolute, positive, ocular proof, the law, wisely, does not require. Nor does negligence have to be proven beyond a reasonable doubt. Circumstantial evidence, such as exists here, and by which

the mind is impelled to make certain deductions, is sufficient."

█ It is urged by defendant, however, that to hold the lower court in error in declining to submit the case to the jury, unless we confine ourselves in testing the correctness of its action to the applicability of res ipsa loquitur, would contravene paragraph 1 of rule XV, Rules of Appellate Procedure. This rule, among other things, requires an appellant, after stating the facts, to make a concise statement of the points relied upon for reversal, and reserves to this court the discretion to decline to review any point not so specified.

We doubt the applicability of this rule to the situation before us. The point relied upon for reversal as set out in plaintiff's original brief is as follows: "The evidence offered by plaintiff was sufficient to support a verdict in her favor."

This is the only error relied upon, and is but another way of saying that the court erred in sustaining defendant's motion for a directed verdict. True, plaintiff bases her argument for showing of error upon the applicability of the doctrine of res ipsa loquitur. And we hold her case was the proper subject of submittal quite apart from the applicability of that doctrine. Strangely, however, as has been suggested, and so far as the record discloses, the doctrine of res ipsa loquitur was not mentioned in the court below. If not, the trial court must have ruled the case upon the mere strength of plaintiff's evidence to carry the case to the jury, uninfluenced by the applicability of that doctrine.

We have then the case of an appellant advancing a single ground for reversal, to wit, claimed error in the trial court's direction of a verdict against her, and supporting the suggestion of error by arguing the applicability of the doctrine res ipsa loquitur. For purposes of decision we consider only evidence pointing to negligence in the instant case (apparently just as did the trial court although it reached a conclusion the opposite of ours), unaided by an inference arising under the doctrine invoked, and hold the claim of error good but for a different reason than that urged.

We do not consider this contravenes in any manner rule XV mentioned above. But, if so viewed, owing to the closely related nature of the two rules, res ipsa loquitur and circumstantial evidence in negligence cases, and the frequency with which in operation they are confused, we should feel our discretion moved to consider the application of the latter rule to the facts of the present case, in testing the correctness of the court's action in directing a verdict against the plaintiff.

██ The defendant also urges the propriety of the trial court's ruling upon the ground that any verdict for the plaintiff would of necessity be supported by raising "presumption on presumption." We are not impressed that such is or would be the case.

"Reasonable inferences drawn from affirmative facts proven are evidence, and not pre-

sumptions built upon other presumptions, as suggested by defendant." Hardwick v. Wabash R. Co., 181 Mo. App. 156, 168 S. W. 328, 330. See, also, Southwest Cotton Co. v. Clements, 25 Ariz. 124, 213 P. 1005; Nicol v. Geitler (Minn.) 247 N. W. 8; Gray v. Hammond Lumber Co., 113 Or. 570, 232 P. 637, 233 P. 561, 234 P. 261. Cf. 1 Wigmore on Evidence (2d Ed.) § 41, p. 258.

What we have said touching the evidence has been solely for the purposes of this decision. It is not to be taken and is not intended as a suggestion upon the weight to be given plaintiff's testimony when the matter shall again come before a jury. The defendant, if the evidence be the same on another trial, may completely overcome the prima facie effect of such evidence. The jury upon the evidence, as it stands, may decline to draw the inference of negligence. But that plaintiff was entitled to have the jury pass on it, and that unexplained it would support an inference of negligence, we entertain no doubt.

The judgment of the lower court will therefore be reversed, and the cause remanded, with directions to award the plaintiff a new trial. The plaintiff will recover her costs in this court, costs in the trial court to abide the final event.

It is so ordered.

WATSON, C. J., and HUDSPETH, BICKLEY, and ZINN, JJ., concur.